<u>FOR</u> <u>PUBLICATION</u>                              [Dkt. Ents. 90, 91, & 92]

**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE**

SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION
LOCAL UNION NO. 27, AFL-CIO,

        Plaintiff,                    Civil No. 07-3023 (RMB/JS)

    v.                                        **OPINION**

E.P. DONNELLY, INC., and
SAMBE CONSTRUCTION CO. INC.,

        Defendants.

Steven J. Bushinsky, Esq.
Mark E. Belland, Esq.
O'Brien, Belland & Bushinsky, LLC
1526 Haddonfield-Berlin Road
Cherry Hill, NJ 08003

    Attorneys for Plaintiff Sheet Metal Workers International
    Association Local Union No. 27, AFL-CIO

Louis Rosner, Esq.
1100 North American Building
121 South Broad Street
Philadelphia, Pa 19107

    Attorney for Defendant E.P. Donnelly, Inc.

Lawren H. Briscoe, Esq.
Melissa C. Angeline, Esq.
Jonathan Landesman, Esq.
Cohen, Seglias, Pallas, Greenhall & Furman, P.C.
30 South 17th Street, 19th Floor
Philadelphia, PA 19103

    Attorneys for Defendant Sambe Construction Co. Inc.

1

**BUMB**, UNITED STATES DISTRICT JUDGE:

This case arises from a dispute over the assignment of roofing work in the construction of Egg Harbor Township's community center.  Plaintiff Sheet Metal Workers International Association Local Union No. 27, AFL-CIO ("Local 27") alleges that by assigning work to a competing union, defendant-contractors E.P. Donnelly, Inc. ("Donnelly") and Sambe Construction Co. Inc. ("Sambe") committed common-law breach of contract and violated New Jersey's statute authorizing project labor agreements, N.J. Stat. Ann. 52:38-1, <u>et</u> <u>seq</u>.  This matter now comes before the Court upon motions for summary judgment by all three parties.  Donnelly and Sambe have opposed Local 27's motion, and Local 27 has likewise opposed the motions of Donnelly and Sambe.  For the reasons stated herein, the Court will grant-in-part and deny-in-part all three motions.

## LEGAL STANDARD

Summary judgment shall be granted if there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law.  Fed. R. Civ. P. 56(c); <u>Hersh v.</u> <u>Allen Products Co.</u>, 789 F.2d 230, 232 (3d Cir. 1986).  A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the non-moving party."  <u>See</u> <u>Anderson</u> <u>v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 248 (1986).  "At the summary judgment stage the judge's function is not . . . to weigh

2

the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. "In making this determination, a court must make all reasonable inferences in favor of the non-movant." Oscar Mayer Corp. v. Mincing Trading Corp., 744 F. Supp. 79, 81 (D.N.J. 1990) (citing Meyer v. Riegel Products Corp., 720 F.2d 303, 307 n.2 (3d Cir. 1983)). However, "the party opposing summary judgment 'may not rest upon the mere allegations or denials of the . . . pleading'; its response, 'by affidavits or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial.'" Saldana v. Kmart Corp., 260 F.3d 228, 232 (3d Cir. 2001) (quoting Fed. R. Civ. P. 56(e)).

## BACKGROUND

The facts underlying this litigation are largely undisputed. At the center of this complex case is a simple dispute regarding the assignment of work in the construction of a public community center in Egg Harbor Township, New Jersey ("the Township"). The Township required that all parties participating in the construction project be signatories to a Project Labor Agreement ("PLA"),[1] which the Township had adopted as authorized by state

---

[1] For a thorough explanation of project labor agreements, see George Harms Const. Co., Inc. v. New Jersey Turnpike Authority, 137 N.J. 8, 21-24, 644 A.2d 76 (1994). In part, the New Jersey Supreme Court explained:

Employers will often enter master agreements with [labor] councils . . . to mitigate the effect of jurisdictional

3

law.  See N.J. Stat. Ann. § 52:38-1, et seq.  Sambe Construction

Company ("Sambe") was the general contractor on the project and,

as required, was a signatory to the PLA.  Sambe subcontracted to

E.P. Donnelly Inc. ("Donnelly") the work of installing

prefabricated standing seam metal roofing, soffit, fascia, and

related trim.  Donnelly, as part of its deal with Sambe, signed a

letter of assent (the "Letter of Assent") binding it to the PLA,

and agreeing that any party to which it subcontracted work would

likewise be required to assent to the PLA.

Contrary to the Letter of Assent, however, Donnelly

subcontracted with a non-signatory to the PLA, the Brotherhood of

Carpenters and Joiners of America Local Union No. 623 ("Local

623"), to perform standing seam metal roofing work on the

project.  Donnelly apparently hired Local 623 because it had a

---

disputes among unions on the progress of construction
projects. . . . A project-labor agreement is a form of
master agreement limited to one project.  Most such
agreements require the contractors and subcontractors to
recognize a particular labor organization as bargaining
representative for all craft employees, to hire workers
through the hiring halls of the organization's
constituent unions, to require hired workers to join the
relevant union within seven days, to follow specified
dispute-resolution procedures, to apply the
organization's wage, benefit, seniority, apprenticeship
and other rules, and to make contributions to the unions'
benefit funds.  In return for the proprietor's promise to
insist that contractors sign the agreement, the
organization promises the proprietor labor peace
throughout the life of the construction project.

Id. at 23-24 (internal citations omitted).

4

collective bargaining agreement with that union.  However, as
mentioned, Local 623 was not a signatory to the PLA and refused
to execute the PLA.  In other words, Donnelly, by assenting to
both the PLA and Local 623's collective bargaining agreement, had
created for itself conflicting contractual obligations.[2]

Another union, Sheet Metal Workers International Association
Local 27, AFL-CIO ("Local 27"), which was a PLA signatory,
protested Donnelly's wrongful assignment of work to Local 623.
Invoking the PLA's provision for settling jurisdictional disputes
between unions, Local 27 scheduled a hearing before arbitrator
Stanley Aiges.  Donnelly then filed an unfair labor practice
charge with the National Labor Relations Board against Local 623,
which had threatened to picket the project if Donnelly reassigned
the roofing work to Local 27.  (Local 623, citing its position
that the PLA is invalid, declined to participate in the
arbitration.)  Arbitrator Aiges ultimately awarded the disputed
work to Local 27.  Local 27 then sought confirmation of the
arbitration award by the Local Joint Adjustment Board ("JAB"),

---

[2] Importantly, this fact is undisputed.  (See Donnelly's
Stat. Mat. Fcts. ¶¶ 5-6 [Dkt. Ent. 90:1]; Donnelly's Ctr.-Stat.
Mat. Fcts. ¶¶ 5, 10 [Dkt. Ent. 104].)  There is no doubt that:
(a) Donnelly executed the Letter of Assent, (b) the Letter of
Assent required that parties hired by Donnelly agree to the PLA's
terms, and (c) Donnelly hired Local 623 in spite of its refusal
to be bound by the PLA.  Although Donnelly has argued, vigorously
and repeatedly, that its obligations under the Letter of Assent
and the PLA are not enforceable in this Court, Donnelly does not
dispute that it betrayed its obligations under the PLA and the
Letter of Assent in hiring Local 623.

which determined that Donnelly and Sambe had violated the PLA and Local 27's collective bargaining agreement, and, further, that Sambe and Donnelly would be responsible for Local 27's wages and benefits in the amount of $428,319.26 if Local 27 was not ultimately awarded the work.[3]

Local 27 then filed this action against Donnelly and Sambe, as well as Local 623,[4] seeking a preliminary injunction to enforce the awards of Arbitrator Aiges and the JAB.  The Court, finding no irreparable injury, declined to issue the preliminary injunction.[5]  The parties proceeded to conduct discovery on the merits of Local 27's allegations.

In the meantime, proceedings before the NLRB, which had been

---

[3] It is curious why Local 27 sought confirmation of Arbitrator Aiges's award by filing a grievance with the JAB pursuant to its collective bargaining agreement, rather than timely petitioning this Court to confirm the award before the NLRB issued its 10(k) Decision.  See 9 U.S.C. §§ 9, 13 (establishing the procedure for confirmation of an arbitration award in federal court).
    In the course of this litigation, the parties have disputed whether they are bound by Local 27's collective bargaining agreement and, consequently, are bound by the JAB decision. Local 27 has argued that its collective bargaining agreement was incorporated into the PLA by way of attachment, while Sambe and Donnelly have argued that the collective bargaining agreement was not attached to the PLA.  The Court need not resolve this fact dispute, however, because the JAB proceeding is not material to its ruling today.

[4] Local 623 was subsequently dismissed from the case.

[5] As mentioned in note 3, supra, the matter before the Court was a preliminary injunction, not a petition to enforce the arbitration award pursuant to 9 U.S.C. §§ 9, 13.

initiated by Donnelly, continued.  On December 31, 2007, the NLRB
ruled that Local 623, rather than Local 27, was entitled to the
disputed work.  Despite this conclusion, the NLRB's ruling,
apparently recognizing that Donnelly had created for itself
conflicting contractual obligations, stated that Donnelly "would
continue to be bound under the terms of the PLA, and the parties
to the PLA would retain any rights they may have under state law
to bring a suit for damages . . . for any breach of the PLA."
United Brotherhood of Carpenters and Joiners of America, Local
Union No. 623 and E.P. Donnelly, Inc., and Sheet Metal
Workers' International Assoc., Local 27, AFL-CIO, 351 NLRB 1417,
1419-20 (Dec. 31, 2007) (hereinafter "10(k) Decision").  In spite
of this proviso, however, Donnelly filed an Unfair Labor Practice
charge with the NLRB, pursuant to section 8(b)(4)(ii)(D) of the
National Labor Relations Act, as amended, 29 U.S.C. §
158(b)(4)(ii)(D), alleging that Local 27's lawsuit in this Court,
by seeking the reassignment of work in contravention of the
NLRB's 10(k) Decision, amounted to an unfair labor practice.
Administrative Law Judge Joel P. Biblowitz sustained Donnelly's
charge.  That decision is still pending for final determination
by the NLRB.

      In light of the NLRB's 10(k) Decision awarding the disputed
work to Local 623, and this Court's decision declining to issue a
preliminary injunction, Local 623 proceeded to perform the

7

roofing work.  The work has now been completed.

Shortly after this Court denied summary judgment earlier in this litigation,[6] the NLRB filed an emergent application [Dkt. No. 08-1896] to enjoin Local 27's prosecution of this suit, pursuant to section 10(l) of the National Labor Relations Act, as amended, 29 U.S.C. § 160(l).  The Court, finding no incompatibility between the NLRB's 10(k) Decision and the relief sought by Local 27's Second Amended Complaint, denied the NLRB's emergent application.[7]  The NLRB has appealed that decision to the United States Court of Appeals for the Third Circuit, which

_____

[6] Summary judgment was denied as premature, pursuant to Rule 56(f).  (Op. 9-13 [Dkt. Ent. 60].)

[7] The Court denied the NLRB's emergent application for a variety of reasons set forth in its September 2, 2008 Opinion. [Dkt. No. 08-1896, Ent. 15.]  First, the Court found no conflict between the NLRB's 10(k) Decision and the relief sought by Local 27 here, because the 10(k) Decision included the express qualification that parties to the PLA would retain the right to sue Donnelly for damages.  Second, the Court explained that, unlike the precedent cases, this is not a mere jurisdictional dispute between competing unions; it is a dispute arising from an employer's voluntary assumption of conflicting contractual obligations.  If obligations under a project labor agreement can be vitiated by mere assent to a conflicting contract, then project labor agreements, which are authorized by state statute, would be rendered wholly ineffective.  Third, the Court found that an injunction -- a "highly disfavored remedy" -- was inappropriate here, as such relief was neither necessary to preserve the status quo, nor to protect the public.  Finally, the Court held that "the 10(k) procedure exists to resolve the inevitable jurisdictional disputes that arise between unions without costly work stoppages, not to exonerate employers with unclean hands."  (Op. 23.)  Accordingly, an injunction would not have advanced the statute's remedial purposes.

has yet to rule.[8]

Because Local 27 was not enjoined from prosecuting this action, the parties have continued to litigate it.  Local 27, Donnelly, and Sambe all now move for summary judgment.

## DISCUSSION

### A.  Contract Claim

Local 27's Second Amended Complaint asserts two causes of action: common-law breach of contract and violation of New Jersey's statute authorizing project labor agreements, N.J. Stat. Ann. 52:38-1, et seq.  The Court begins its analysis with the contract claim.

"To establish a breach of contract claim, a plaintiff has the burden to show that the parties entered into a valid contract, that the defendant failed to perform [its] obligations under the contract and that the plaintiff sustained damages as a result."  Murphy v. Implicito, No. L-5998-00, 2005 WL 2447776, *4 (N.J. Super. 2005) (citing Coyle v. Englander's, 199 N.J. Super. 212, 223, 488 A.2d 1083 (1985)).  Here, Local 27 alleges that it, Sambe, and Donnelly assented to the PLA, a valid contract; that Sambe and Donnelly breached the PLA by assigning the roofing work to Local 623; and that its damages are equal to the payment it

_____

[8] The Court questions whether its ruling today renders moot the Third Circuit appeal.  The conclusion of this case would seem to render a petition to enjoin the prosecution moot, leaving no "case or controversy."

9

would have received for performing the roofing work.

It is undisputed that Local 27 suffered damages from the assignment of the roofing work to another union.  Thus, the only elements of the contract claim at issue are: (1) whether Sambe and Donnelly failed to perform their obligations under the PLA, and (2) whether the PLA is a valid contract.[9]

### 1.   Failure to Perform PLA Obligations:  Preclusive Effect of the Arbitration Award

Turning to the first element, failure to perform PLA obligations, Arbitrator Aiges's ruling specifically found that "Sambe [and] Donnelly violated the . . . PLA by assigning the disputed work to members of . . . Local 623."  (Arb. Op. 13-14 [Dkt. Ent. 91:6].)  If the Court is bound by this finding, Local 27 will have established that obligations owed under the contract were breached.[10]

Because Local 27 never sought confirmation of the arbitration award by a court, however, it lacks the status of a

_____

[9] Sambe and Donnelly have not questioned the standing of Local 27 to bring a contract claim against them.  As a party to the PLA, Local 27 clearly has standing to sue for breach of the PLA.  Further, because the Letter of Assent was executed for benefit of PLA signatories, Local 27 was a third-party beneficiary of the Letter of Assent.  See Werrmann v. Aratusa, Ltd., 266 N.J. Super. 471, 476, 630 A.2d 302 (1993).

[10] Sambe and Donnelly argue that Arbitrator Aiges's award is not enforceable in this Court.  These arguments overlap with the final element of a contract claim, namely, validity of the contract.  As the Court will discuss, infra, because the PLA is valid and enforceable, Arbitrator Aiges's award may be enforced here.

judgment.  See 9 U.S.C. §§ 9, 13 (establishing the procedure for confirmation of an arbitration award in federal court).  Thus, the Court must decide what preclusive effect to give it in this proceeding.[11]  See Wright, Miller, & Cooper, 18B Federal Practice and Procedure: Jurisdiction § 4475.1 at n.6 (WL 2009) ("Arbitral awards, unreviewed by any court, are not such judgments as are entitled to recognition under the full faith and credit statute, 28 U.S.C.A. § 1738.  Any decision to accord preclusive effect thus must be a matter of a judicially fashioned preclusion rule.").

Judicial proceedings ordinarily accord preclusive effect to arbitrations that have already adjudicated the same claims or defenses, even when the award is unconfirmed.  See id. at note 8 and accompanying text; see also In re Kaplan, 143 F.3d 807, 815 (3d Cir. 1998) ("Generally applicable res judicata rules must sometimes be adapted to fit the arbitration context.").  "If any party dissatisfied with [an arbitration] award were left free to pursue independent judicial proceedings on the same claim or defenses, arbitration would be substantially worthless."  Wright, Miller, & Cooper, supra, at § 4475.1.  Although the Third Circuit has not yet defined the parameters of according preclusive effect

---

[11] This issue was not raised by the parties.  Local 27 has asserted that the Court should be deferential to Arbitrator Aiges's ruling, but the parties neglected to discuss what legal effect the unconfirmed arbitration has in this proceeding.

to an unconfirmed arbitration award, the Restatement (Second) on
Judgments has summarized the judicial consensus that "a valid and
final award by arbitration has the same effects under the rules
of res judicata . . . as a judgment of a court" as long as the
following five "essential elements of adjudication" are
satisfied:

> (a) Adequate notice to persons who are to be bound by the
> adjudication . . . ;
> (b) The right on behalf of a party to present evidence
> and legal argument in support of the party's contentions
> and fair opportunity to rebut evidence and argument by
> opposing parties;
> (c) A formulation of issues of law and fact in terms of
> the application of rules with respect to specified
> parties concerning a specific transaction, situation, or
> status, or a specific series thereof;
> (d) A rule of finality, specifying a point in the
> proceeding when presentations are terminated and a final
> decision is rendered; and
> (e) Such other procedural elements as may be necessary to
> constitute the proceeding a sufficient means of
> conclusively determining the matter in question, having
> regard for the magnitude and complexity of the matter in
> question, the urgency with which the matter must be
> resolved, and the opportunity of the parties to obtain
> evidence and formulate legal contentions.

Restatement (2d) of Judgments §§ 83, 84 (1982).[12]  Here, there is
no genuine dispute that the procedures governing the arbitration
were fair and that the arbitration produced a final award.[13]

---

[12] Restatement (2d) of Judgments § 84 has been cited
approvingly by the Third Circuit in <u>Witkowski v. Welch</u>, 173 F.3d
192, 199-200 (3d Cir. 1999).  That case is distinguishable,
however, since the arbitration award had been confirmed by a
district court.

[13] Sambe and Donnelly have raised only one argument
implicating the fairness of the arbitration proceeding.  They

Indeed, the strong preference of federal labor policy for private resolution of labor disputes weighs heavily in favor of attributing preclusive effect to full, fair, and final labor arbitrations.  See, e.g., NLRB v. A. Duie Pyle, Inc., 730 F.2d 119, 124 (3d Cir. 1984) (noting that the law gives highly favorable status to private, amicable resolution of labor disputes); NLRB v. Pincus Bros., Inc.-Maxwell, 620 F.2d 367, 372 (3d Cir. 1980) (acknowledging national policy in favor of the private resolution of labor disputes through consensual arbitration).  Accordingly, the Court will accord preclusive effect to the arbitration proceeding here.

The scope of an arbitrator's task is defined by contract. See Kaplan, 143 F.3d at 816 ("[T]he scope of the obligation to arbitrate -- and to accept arbitral decisions -- is defined by contract.").  Here, Local 27 sought arbitration pursuant to article 10 of the PLA, which establishes the jurisdiction of an arbitrator to resolve jurisdictional disputes, and, further,

---

allege that Arbitrator Aiges contacted Robert Tarby, Local 623's representative, and inquired whether Local 623 would agree to sign the PLA. (Donnelly's Mot. Br. 15-16.)  Assuming the truth of this allegation, it is not clear why this would undermine the arbitration proceeding's fairness.  Such contact could only redound to the benefit of Sambe and Donnelly, as Local 623's agreement to be bound by the PLA would likely have resulted in a finding that Sambe and Donnelly had not breached the PLA by assigning to Local 623 the disputed work.  The fact that Local 623 ultimately refused to agree to the PLA had no effect on Arbitrator Aiges's determination -- Local 623 was never, and would never be, a PLA party.  Accordingly, there are no genuine issues of material fact bearing upon the arbitration's fairness.

states that the "jurisdictional award . . . shall be final and binding on the disputing Local Unions and the involved Contractor[s] . . . , and may be enforced in any court of competent jurisdiction."  (PLA, art. 10, § 4 [Dkt. Ent. 91:4].)

In his written opinion, Arbitrator Aiges properly found that the PLA, in section 3 of article 10, conferred upon him jurisdiction to settle the work-assignment dispute between Local 27, Sambe, Donnelly, and Local 623.  (Arb. Op. 9 [Dkt. Ent. 91:6] ("I am fully convinced this dispute is properly before me for adjudication.  It arose over work covered by the PLA.  Local 27 sought to follow the procedure set forth in Article 10, Section 3A of the PLA. . . . Local 27 then decided -- as was its right -- to invoke the procedure specifically agreed upon under Section 3C to resolve 'all unresolved jurisdictional disputes arising under this [PLA].'").)  Because the matter of Arbitrator Aiges's jurisdiction was disputed and resolved before him, this Court is bound by his finding.[14]  Jurisdiction before Arbitrator Aiges was

---

[14] Even if the Court were not bound by Arbitrator Aiges's finding, it agrees that he had proper jurisdiction under the PLA. Local 27 sought resolution of this work-assignment dispute under article 10 of the PLA -- the mechanism for resolving jurisdictional disputes.  Sambe and Donnelly now argue that Local 27 should instead have followed the procedure of article 9, which addresses grievances arising under the PLA generally.  This is a perplexing position, since Sambe and Donnelly do not contest that the dispute before Arbitrator Aiges was a jurisdictional dispute. Article 9 applies to disputes between PLA signatories "except[] jurisdictional disputes . . . ."  (PLA, art. 9, § 1(b).)  It is inapposite that Local 27 began, but did not complete, the article 9 procedure, because Local 27 had no obligation to seek redress

therefore proper.

Arbitrator Aiges cited two reasons for his determination that the roofing work should have been assigned to Local 27, rather than Local 623.  The primary justification for his ruling was founded in article 10, section 2(b), of the PLA, which requires work assignments to be made "according to area practice . . . ."  (PLA, art. 10, § 2(b).)  Because "[t]he vast majority of projects involving similar work in South Jersey has been performed by Local 27 members," Arbitrator Aiges determined that "area practice" compelled assignment of the work to Local 27.  (Arb. Op. 12 [Dkt. Ent. 91:6].)  Secondarily, Arbitrator Aiges, citing a letter by the Egg Harbor Township Administrator, explained that the work should have been assigned to a PLA signatory.  As Local 27 had assented to the PLA, while Local 623 had not, this further required assignment of the work to Local 27.  (Arb. Op. 12-13.)  On these two grounds, Arbitrator Aiges found that "Sambe [and] Donnelly violated the . . . PLA by assigning the disputed work to members of . . . Local 623."[15]

_____

under article 9.

[15] Sambe and Donnelly argue that this finding was beyond the scope of Arbitrator Aiges's authority, because article 10 of the PLA permits only the resolution of jurisdictional disputes, not contract claims.  However, Arbitrator Aiges's finding that Sambe and Donnelly violated the PLA was an analytical step in his resolution of the jurisdictional dispute.  Accordingly, this finding was not outside the scope of his article 10 authority.

(Arb. Op. 13-14.)  This Court is bound by his finding.[16]
Accordingly, Local 27 has established as a matter of law that
obligations owed by Sambe and Donnelly under the PLA were not
performed.

### 2.   **Validity of the PLA**

Having established that the assignment of work to Local 623
violated the PLA and caused damage to Local 27, Local 27 will
have proven its breach of contract claim if the PLA is a valid
contract.  For the following reasons, the Court holds that it is.

### i.   **Lawfulness of the PLA under the NLRA**

Sambe and Donnelly first argue that the PLA is an invalid

---

[16] Even were Arbitrator Aiges's ruling not entitled to
preclusive effect, the Court rules in the alternative that the
undisputed evidence demonstrates that Sambe and Donnelly breached
their PLA obligations.

As to Donnelly:  It is undisputed (1) that Donnelly was
bound by the PLA, (2) that the PLA permitted the assignment of
work only to unions that had executed the PLA, (3) that Local 623
had not executed the PLA, (4) that Local 27 had executed the PLA,
and (5) that Donnelly assigned work to Local 623 rather than
Local 27.  Accordingly, as a matter of simple logic, Donnelly
breached its PLA obligations.

As to Sambe:  The PLA provides that "the General Contractor
shall require all Contractors of whatever tier who have been
awarded contracts for work covered by this Agreement, to accept
and be bound by the terms and conditions of the Project Agreement
by executing the Letter of Assent prior to commencing work.  The
General Contractor shall assure compliance with this Agreement by
the Contractors."  (PLA, art. 3, § 1 (emphasis added).)  Although
Sambe argues that it discharged it contractual duty by requiring
Donnelly to execute the Letter of Assent, the PLA clearly
required Sambe to "assure [Donnelly's] compliance," which, it is
undisputed, it did not do.  Thus, even setting to the side
Arbitrator Aiges's finding, there is no genuine issue of material
fact as to whether Sambe and Donnelly failed to perform their PLA
obligations.

pre-hire agreement under the National Labor Relations Act.
Generally, the NLRA preempts state regulation of labor policy.
See Northern Illinois Chapter of Associated Builders and
Contractors, Inc. v. Lavin, 431 F.3d 1004, 1005 (7th Cir. 2005)
("Federal law preempts all state regulation of those aspects of
labor relations that are arguably protected, arguably prohibited,
or left to the domain of market forces."). However, the Supreme
Court has held that when a government entity acts as a market
participant rather than a regulator, normal preemption rules do
not apply. See Wisconsin Dept. of Industry, Labor and Human
Relations v. Gould Inc., 475 U.S. 282, 289 (1986). In Boston
Harbor, the Supreme Court applied that rule to pre-hire
agreements like the PLA. Building & Const. Trades Council of
Metropolitan Dist. v. Associated Builders & Contractors of
Massachusetts/Rhode Island, Inc., 507 U.S. 218, 229-30 (1993)
(hereinafter "Boston Harbor").

At issue in Boston Harbor was a pre-hire agreement created
by a general contractor, Kaiser Engineers, Inc., which had been
retained by a state agency to manage an environmental cleanup
job. Kaiser Engineers, Inc. negotiated a "Master Labor
Agreement" to govern hiring of subcontractors, which the state
agency then formally adopted. The First Circuit held that the
pre-hire agreement was preempted by federal law, as it
constituted "pervasive" state "intrusion into the bargaining

17

process."  935 F.2d 345, 353 (1st Cir. 1991).  If the state were the actual employer, the First Circuit reasoned, the pre-hire agreement would be permissible;[17] however, the state's role was that of regulator, not employer, and such regulation is preempted by the NLRA.  Id. at 354-55.  The Supreme Court disagreed.  The Court held that a state agency hiring a contractor acts as a market participant, not a regulator, that may "manage its own property when it pursues its purely proprietary interests . . . [as a] private [actor] would be permitted [to do]."  Boston Harbor, 507 U.S. at 231-32.  The crux of the Court's decision was that where pre-hire agreements are at issue, the same rules govern public and private market participants.  See id. at 233 ("[W]hen the [State], acting in the role of purchaser of construction services, acts just like a private contractor would act, and conditions its purchasing upon the very sort of labor agreement that Congress explicitly authorized and expected frequently to find, it does not 'regulate' the workings of the market forces that Congress expected to find; it exemplifies them.").

Sambe and Donnelly try to distinguish Boston Harbor from the facts of this case by noting that a private contractor, Kaiser Engineers, Inc., created the pre-hire agreement in Boston Harbor, while Egg Harbor Township, the public purchaser, created it here.

_____

[17] Here, of course, the state is the employer.

18

This amounts to a distinction without a difference.  As the Third Circuit has explained, "[A]fter Boston Harbor, preemption analysis only comes into play when the state's activity in question constitutes 'regulation.'  But a state will not be subject to preemption analysis when it acts as a 'market participant.'"  Hotel Employees & Restaurant Employees Union, Local 57 v. Sage Hospitality Resources, LLC, 390 F.3d 206, 213 (3d Cir. 2004).  There is no dispute that Egg Harbor Township acted as any private developer would in requiring that Sambe and its subcontractors assent to the PLA as a precondition to participating in construction of the public community center.[18] The fact that the entity negotiating the pre-hire agreement here was public rather than private is of no moment, as numerous courts have applied the Boston Harbor rule to public project labor agreements.  See, e.g., Colfax Corp. v. Illinois State Toll

---

[18] Remarkably, none of the parties cited in their briefs the leading Third Circuit case that instructs district courts in how to apply Boston Harbor.  In Sage, the Third Circuit announced a two-part test to determine if a government's condition of funding falls within the Boston Harbor exception to preemption review:

First, does the challenged funding condition serve to advance or preserve the state's proprietary interest in a project or transaction, as an investor, owner, or financier? Second, is the scope of the funding condition "specifically tailored" to the proprietary interest?  If a condition of procurement satisfies these two steps, then it reflects the government's action as a market participant and escapes preemption review.

390 F.3d at 216 (emphasis added).

Highway Authority, 79 F.3d 631, 634-35 (7th Cir. 1996); Lott
Constructors, Inc. v. Camden County Bd. of Chosen Freeholders,
No. 93-5636, 1994 WL 263851, *13-19 (D.N.J. Jan. 31, 1994)
(Simandle); George Harms, 137 N.J. at 14-16; New York State
Chapter, Inc. v. New York State Thruway Authority, 620 N.Y.S.2d
855, 856-57 (N.Y. App. Div. 1994).  Sambe and Donnelly have not
cited to a single court that has adopted their narrow reading of
Boston Harbor, and this Court finds no reason to do so here.[19]
Accordingly, federal preemption does not undermine the validity
of the PLA in this case.

_____

      [19] Sambe and Donnelly read Boston Harbor to exclude publicly
adopted project labor agreements because a public entity like Egg
Harbor Township is not "an employer engaged primarily in the
building and construction industry," as contemplated by § 8(f) of
the NLRA.  See 29 U.S.C. §§ 158(f).  Sambe and Donnelly
understand this clause to mean that an employer must do primarily
building and construction work to fall within the § 8(f)
exception.  This is not the only plausible reading of the
statutory language, however.  The clause may also be read to mean
that the § 8(f) exception applies to employers of any kind when
they are engaged in projects consisting primarily in building and
construction work.  In other words, rather than reading the
clause to mean "an employer [that] engage[s]" in construction, it
may be read to mean "an employer [when] engaged" in construction.
      This alternative interpretation is preferable, as it squares
the statutory language with the precedential cases.  The Court
knows of no cases in which courts have inquired into whether a
developer -- public or private -- does "primarily" building and
construction work.  Indeed, many private developers are, like the
Township, engaged in other non-construction business, such as
financial investment.  Here, the Township negotiated and adopted
the PLA specifically for construction of its community center.
(Sambe's Stat. Mat. Fcts. ¶ 5 [Dkt. Ent. 93].)  For purposes of
that project, the Township is indistinguishable from a private
developer.  Accordingly, the Court holds that the Township was
"an employer engaged primarily in the building and construction
industry" when it undertook to construct a community center.

### ii. <u>Lawfulness of the PLA under New Jersey's</u> <u>Project Labor Agreement Statute</u>

Sambe and Donnelly next argue that the PLA violates New Jersey's statute authorizing project labor agreements, N.J. Stat. Ann. § 52:38-1, <u>et seq</u>.  The statute provides, in relevant part:

> A public entity may include a project labor agreement in a public works project on a project-by-project basis, if the public entity determines, taking into consideration the size, complexity and cost of the public works project, that, with respect to that project the project labor agreement will meet the requirements of section 5 of this act, including promoting labor stability and advancing the interests of the public entity in cost, efficiency, skilled labor force, quality, safety and timeliness.

N.J. Stat. Ann. § 52:38-3.  Section 5 continues:

> Each project labor agreement executed pursuant to the provisions of this act shall:
> a. Advance the interests of the public entity, including the interests in cost, efficiency, quality, timeliness, skilled labor force, and safety;
> b. Contain guarantees against strikes, lock-outs, or other similar actions; . . .
> f. Fully conform to all statutes, regulations, executive orders and applicable local ordinances regarding the implementation of set-aside goals for women and minority owned businesses, the obligation to comply with which shall be expressly provided in the project labor agreement . . . .

N.J. Stat. Ann. § 52:38-5.  Sambe and Donnelly contend that the Township adopted the PLA without making a predicate determination that the enumerated requirements were met.

Specifically, Sambe and Donnelly cite the Township Administrator's admission "that the Township never performed any study regarding the need for a project labor agreement" as

evidence that the Township failed to make the statutorily
required findings.  (Sambe's Mot. Br. 27.)  However, the statute
does not require municipalities to perform a study, and
Defendants have cited nothing in support of their conclusion that
the Township did not make the required determinations.  <u>See
Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986) ("[A] party
seeking summary judgment always bears the initial responsibility
of informing the district court of the basis for its motion, and
identifying those portions of 'the pleadings, depositions,
answers to interrogatories, and admissions on file, together with
the affidavits, if any,' which it believes demonstrate the
absence of a genuine issue of material fact." (citing Fed. R.
Civ. P. 56(c)).  Moreover, article 1 of the PLA explicitly makes
many of the findings set forth in the statute, including a
statement that its purpose is "to provide for efficiency, safety,
quality construction, and the timely completion of a construction
project . . . in a manner designed to afford lower reasonable
costs to [the Township], and for the advancement of public policy
objectives."  (PLA, art. 1.)

     As to the statute's requirement that project labor
agreements "[c]ontain guarantees against strikes, lock-outs, or
other similar actions," N.J. Stat. Ann. § 52:38-5(b), article 7
of the PLA specifically bars such activity, and the dispute
resolution procedures of articles 9 and 10 exist to avert these

sorts of work disruptions. As to the statute's requirement that project labor agreements "conform to all statutes, regulations, executive orders and applicable local ordinances regarding the implementation of set-aside goals for women and minority owned businesses, the obligation to comply with which shall be expressly provided in the project labor agreement," N.J. Stat. Ann. § 52:38-5(f), section 4 of article 4 of the PLA, as well as article 15 of the PLA, satisfy this requirement. Accordingly, the arguments that the PLA does not comply with New Jersey's project labor agreement statute are unavailing.[20]

### 3.  **Enforceability of the PLA**

Having found that the PLA is a valid contract, that its obligations were unfulfilled, and that Local 27 suffered

---

[20] Sambe and Donnelly also argue that the PLA is invalid under New Jersey Supreme Court precedent. The authorities they cite, however, stand only for the proposition that the New Jersey Legislature had not yet delegated authority to state and local agencies to create restrictive project labor agreements. See George Harms, 137 N.J. at 45 ("The several interests of labor, management, and the public . . . can best be accommodated through involvement of the executive and legislative branches in the legislative process[, which have not yet acted].");  Tormee Const., Inc. v. Mercer County Imp. Authority, 143 N.J. 143, 151, 669 A.2d 1369 (1995) ("[W]e recognize that the Legislature is better suited than the judiciary to determine the size, complexity and cost of projects that justify recourse to a PLA. We also believe that the Legislature is better suited to accommodate the several interests of labor, management, and the public. Until such time as the Legislature acts, however, we are obligated to adjudicate such bid specifications case-by-case." (citations omitted)).  Of course, the Legislature subsequently acted to delegate such authority.  See N.J. Stat. Ann. § 52:38-1, et seq.; see also discussion infra at 32-35.  Accordingly, this argument does not warrant further discussion.

resulting damages, Local 27 has satisfied all of the elements required to establish a breach of contract claim.  Sambe and Donnelly advance the further defense that the PLA is unenforceable in this Court.  For the following reasons, the Court rejects this defense.

### i.   **Arbitration Award and the 10(k) Decision**

Sambe and Donnelly resurrect their contention that the PLA is unenforceable because enforcement would conflict with the NLRB's 10(k) Decision.  This argument has been raised in one form or another at each stage of this litigation, and the Court has rejected it every time -- most notably, in its September 2, 2008 Opinion.  Moore-Duncan v. Sheet Metal Workers' Int'l Ass'n, Local 27, AFL-CIO, 624 F. Supp. 2d 367, 373-75, 77 (D.N.J. 2008) (slip op. at 13-19, 22-24).  It does so again now.  Accord Lamb's Chapel v. Center Moriches Union Free School Dist., 508 U.S. 384, 398 (1993) (Scalia, J., concurring) (comparing a revived legal argument to a "ghoul in a late-night horror movie that repeatedly sits up in its grave and shuffles abroad, after being repeatedly killed and buried").[21]

---

[21] In this Court's view, Sambe and Donnelly are judicially estopped from raising this argument.  In the early stages of this lawsuit, Sambe and Donnelly both disputed the propriety of a preliminary injunction by arguing that Local 27 would be able to recover monetary damages in this action.  (Sambe's P.I. Br. 8-11 [Dkt. Ent. 14] ("[T]hese issues are financial in nature and can be remedied by a monetary award."); Donnelly's P.I. Br. 5-8 [Dkt. Ent. 15] ("[T]he loss of income alone does not constitute irreparable harm.").)  Indeed, this argument formed the basis of

Sambe and Donnelly are quite right that Arbitrator Aiges and the NLRB differed on whether the disputed work should be assigned to Local 27 or Local 623.  To the extent that Arbitrator Aiges ordered that the work be assigned to Local 27, his award certainly conflicted with the 10(k) Decision.  But Local 27 does not seek enforcement of that portion of Arbitrator Aiges's award; rather, Local 27 seeks only monetary damages for breach of the PLA.  Enforcement of the PLA with an award of monetary damages against Sambe and Donnelly does not conflict with the NLRB's 10(k) Decision resolving the jurisdictional dispute between Local 27 and Local 623.

The Court acknowledges that the Third Circuit case Local 30 II appears at first pass to support the proposition that "there is no material difference between seeking work and seeking payment in lieu of work . . . ."  Local 30, United Slate, Tile & Comp'n Roofers, Damp & Waterproof Workers Ass'n, AFL-CIO v. NLRB,

---

the Court's ultimate ruling on Local 27's preliminary injunction motion.  Sambe and Donnelly now argue, however, that monetary damages are unavailable, because a damages award would conflict with the NLRB's 10(k) Decision.  "[A] a party should not be allowed to gain an advantage by litigation on one theory, and then seek an inconsistent advantage by pursuing an incompatible theory."  Wright, Miller, & Cooper, 18B Federal Practice & Procedure:  Jurisdiction 2d § 4477 (WL 2009); see also Ryan Operations G.P. v. Santiam-Midwest Lumber Co., 81 F.3d 355, 358 (3d Cir. 1996) ("[Judicial estoppel] is designed to prevent litigants from playing fast and loose with the courts." (citation omitted)).  Although the argument by Sambe and Donnelly is improper, in the interest of completeness, the Court will entertain the argument and will reject it on its merits.

1 F.3d 1419, 1427-28 (3d Cir 1993) (hereinafter "Local 30 II").

The precedential value of this proposition is a matter of

dispute, however, since the Third Circuit adopted what appears to

be an opposite view two years earlier, in Local 30 I.  See Hoeber

ex rel. NLRB v. Local 30, United Slate, Tile & Comp'n Roofers,

Damp and Waterproof Workers Ass'n, ALF-CIO, 939 F.2d 118, 124

n.10 (3d Cir. 1991) (hereinafter "Local 30 I") ("We cannot agree

with the NLRB that seeking enforcement of an arbitral award based

on a breach of contract to assign work is identical to seeking

the disputed work itself.").

Even were Local 30 II construed as a reversal of Local 30 I,

the present case is distinguishable from Local 30 II in a number

of important respects.  First, here, the NLRB's 10(k) Decision

includes the specific qualification that, "An award of the

disputed work to Local 623 [does] not . . . invalidate the PLA.

[Donnelly] continue[s] to be bound under the terms of the PLA,

and the parties to the PLA . . . retain any rights they may have

under state law to bring a suit for damages against [Donnelly]

for any breach of the PLA."  10(k) Decision, 351 NLRB at 1419-20

(emphasis added).  The 10(k) Decision continued, "Both Local 623

and (arguably) Local 27 have separate binding contracts with

[Donnelly], and [Donnelly's] obligations under one contract

cannot be used to void its obligations under the other."  Id. at

1420.  Thus, unlike Local 30 II, the 10(k) Decision here

distinguished its award of work from this contract-enforcement damages action.  A finding that this damages action conflicts with the 10(k) Decision -- when the 10(k) Decision limited itself so as to permit this damages action -- would be nonsensical.

Second, Local 30 II presented a run-of-the-mill jurisdictional dispute between two unions claiming entitlement to a work assignment based upon their respective collective bargaining agreements.  Indeed, the 10(k) procedure exists to resolve these otherwise intractable disputes, and must immunize employers for breaching collective bargaining agreements when carrying out a 10(k) determination.  See Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 272 (1964) ("Should the Board disagree with the arbiter, . . . the Board's ruling would, of course, take precedence; and if the employer's action had been in accord with that ruling, it would not be liable for damages under § 301.").  Here, the Court is presented with a substantially different set of facts.  At issue is not mere resolution of competing collective bargaining agreements; it is a project labor agreement -- a super-contract of sorts[22] -- barring the assignment of work

---

[22] Project labor agreements, by their very operation, must act as "master agreements" that supercede all other labor contracts (especially collective bargaining agreements) bearing on a particular project.  George Harms, 137 N.J. at 24.  The PLA contains a supremacy provision establishing its superior status over collective bargaining agreements.  (PLA, art. 2, § 4.)  Furthermore, the State of New Jersey has adopted a public policy favoring the use of project labor agreements, which would be vitiated if obligations arising under project labor agreements

to non-parties.  As this Court has explained:

> Under [Defendants'] reasoning, any time the Board assigns
> disputed work to one party, all of the employer's related
> contractual obligations disappear.  An employer could
> assume contractual obligations it had no intention of
> performing, and to the possible detriment of others, only
> to be absolved of those obligations under the guise of a
> 10(k) jurisdictional dispute decision of the Board.
> Petitioner's argument taken to its logical conclusion
> would eviscerate project labor agreements such as the PLA
> at issue here, giving contractors a license to sign on to
> projects with no intention of performing their
> contractual obligations.  Local 30 II did not so hold,
> and neither does the Court today.

Moore-Duncan v. Sheet Metal Workers' Int'l Ass'n, Local 27,

AFL-CIO, 624 F. Supp. 2d 367, 375-76 (D.N.J. 2008).

Relatedly -- third -- the 10(k) procedure serves to provide
swift resolution to normal work-assignment disputes that arise
between unions, not to exonerate employers which have acted with
unclean hands.  See Associated General Contractors of America v.
International Union of Operating Engineers, 529 F.2d 1395, 1397
(9th Cir. 1976).  Unlike in Local 30 II, the wrongdoing alleged
here occurred at two moments: first, in Donnelly's execution of
the Letter of Assent, and second, in Donnelly's ultimate
assignment of the roofing work to Local 623.  What distinguishes
this case is not that Donnelly found itself stuck between
conflicting obligations (indeed, labor disputes regularly result
from unforeseen conflicting obligations); it is that Donnelly
voluntarily created the foreseeable conflict.

---

were unenforceable.

28

The one-page Letter of Assent executed by Donnelly contains only three substantive provisions (each one sentence long): first, that Donnelly agrees to be bound by the PLA; second, that Donnelly certifies that "it has no commitments or agreements, which would preclude full compliance" with the PLA; and third, that all project participants must execute an identical Letter of Assent.  Despite these simple terms, Local 623's collective bargaining agreement with Donnelly was a conflicting commitment, since Local 623 -- a union to which Donnelly was already obligated -- was not a party to the PLA.  Stunningly, Donnelly has defended its unconscientious conduct by claiming it "never saw the PLA itself . . . and was not aware that the Carpenters were not included in the PLA."  (Donnelly's Stat. Mat. Fcts. ¶ 5.)  Walking blindfolded through one's business affairs does not excuse the ensuing collision.[23]  The 10(k) procedure exists so disputed work may proceed (as it has here), not to insulate an unscrupulous employer from the consequences of its misconduct.  Such an employer was not before the Third Circuit in <u>Local 30</u>

---

[23] "People are free to sign legal documents without reading them, but the documents are binding whether read or not.  Any other approach would undermine the validity of the written word and encourage people either to close their eyes (hoping that they can reap the benefits without incurring the costs and risks of the venture) or to come up with hard-to-refute tales of not reading or understanding the documents they sign."  <u>Novitsky v. American Consulting Engineers, LLC</u>, 196 F.3d 699, 702 (7th Cir. 1999).

<u>II</u>.[24]

The Court therefore reaffirms its holding that a damages award in this action will not conflict with the <u>10(k) Decision</u>. Accordingly, the <u>10(k) Decision</u> will not impede enforcement of the PLA.

### ii.  **Exhaustion of Contractual Remedies**

Finally, Sambe and Donnelly argue that the PLA is unenforceable before this Court because Local 27 did not exhaust the private remedies available under the PLA before initiating this action.  Citing Third Circuit and Supreme Court precedents, Sambe and Donnelly contend that Local 27 was required to seek redress under the arbitration procedures of <u>both</u> articles 9 and 10 of the PLA.  <u>See</u> <u>Republic Steel Corp. v. Maddox</u>, 379 U.S. 650, 652 (1965) ("[F]ederal labor policy requires that individual employees wishing to assert contract grievances must attempt use of the contract grievance procedure agreed upon by employer and union as the mode of redress."); <u>Whittle v. Local 641, International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO</u>, 56 F.3d 487, 490 (3d Cir. 1995). This argument misapplies these precedents.  Although Sambe and Donnelly are quite right that labor-dispute plaintiffs are

---

[24] The Court makes these observations only to distinguish this case from <u>Local 30 II</u>.  The Court has proceeded upon the assumption that Donnelly's account of the facts is true. Accordingly, nothing in this discussion shall be construed as a weighing of the evidence.

required to pursue contractual remedies such as arbitration before seeking federal court enforcement, there is no requirement that such plaintiffs pursue every alternative private remedy where the controlling contract offers more than one. Here, Local 27 could have chosen to pursue the remedy contemplated in article 9, or that in article 10, of the PLA. Local 27 selected the route prescribed by article 10. In doing so, it satisfied the exhaustion requirement.

Accordingly, Local 27 has established all three elements of its breach of contract claim, and the operative contract is enforceable in this Court. Thus, the Court finds as a matter of law that Sambe and Donnelly are liable for common-law breach of contract.[25] Summary judgment shall be granted to Local 27 on this count.[26]

---

[25] By way of clarification, the Court does <u>not</u> hold that the disputed roofing work should ultimately have been performed by Local 27 rather than Local 623. It appears that Donnelly effectively promised the work to two different unions. The NLRB decided that Local 623 had a stronger claim to the work than Local 27. The Court has no quarrel with that determination. (Indeed, the Court take no position whatsoever on that issue, as it is beyond the scope of the Second Amended Complaint.) The Court today holds only that Donnelly continues to be liable for effectively promising the work to Local 27.

[26] The parties' briefs do not discuss the matter of damages, so the Court is unsure of whether a valuation of the contract claim will turn upon any disputed issues of material fact. The parties are therefore instructed to promptly confer and advise the Court on whether a brief trial will be necessary to determine damages.

**B.**   **Private Right of Action under New Jersey's PLA Statute**

The Court now turns to the second cause of action asserted by Local 27: violation of New Jersey's statute authorizing project labor agreements, N.J. Stat. Ann. § 52:38-1, et seq. Sambe and Donnelly contend that the statute does not create a private right of action.   The Court agrees.

To determine whether a statute implies a right of action, New Jersey courts consider "whether the plaintiff is 'one of the class for whose especial benefit the statute was enacted;' whether there is any evidence that the Legislature intended to create a private cause of action under the statute; and whether implication of a private cause of action in this case would be 'consistent with the underlying purposes of the legislative scheme.'" Matter of State Com'n of Investigation, 108 N.J. 35, 41, 527 A.2d 851 (1987) (quoting Cort v. Ash, 422 U.S. 66, 78 (1975)).   In other words, the touchstone in finding an implied right of action is the legislative intent.   See Liberty Bell Bank v. Deitsch, No. 08-0993, 2008 WL 4276925, *3 (D.N.J. Sept. 9, 2008) ("This factor alone, without regard to the others, has been dispositive in recent cases.").   In addition to a general presumption against finding a civil remedy when none is explicitly conferred, R.J. Gaydos Ins. Agency, Inc. v. National Consumer Ins. Co., 168 N.J. 255, 271, 773 A.2d 1132 (2001), federal courts are reluctant to innovate a state right of action

when the state's own courts have not done so, <u>Swerhun v. Guardian Life Ins. Co. of America</u>, 979 F.2d 195, 795 (11th Cir. 1992) (citing <u>A&E Supply Co., Inc. v. Nationwide Mut. Fire Ins. Co.</u>, 798 F.2d 669, 674 (4th Cir. 1986)).

Here, the legislative intent weighs against finding a private right of action. The purpose of the statute is to <u>authorize</u> the use of restrictive project labor agreements. <u>See</u> N.J. Stat. Ann. § 52:38-3 ("A public entity may include a project labor agreement in a public works project on a project-by-project basis . . . ."). The statute aimed to expand the powers of state and local government agencies by allowing them to adopt master pre-hire agreements. The New Jersey Legislature enacted the statute in response to a line of executive orders and state Supreme Court decisions that cast doubt upon the power of state entities to employ project labor agreements.[27] First, in September 1993, Governor James Florio signed Executive Order 99 requiring the successful bidders for public construction projects to execute project labor agreements. Then, in March 1994, Governor Christine Todd Whitman issued Executive Order 11, which softened the mandate of its predecessor by permitting the use of project labor agreements when state departments, on a project-by-project basis and with publicly disclosed findings, determine

---

[27] The parties neglected to discuss this background in their briefs.

that they "will promote labor stability and advance the state's
interest in cost efficiency, quality, safety and/or timeliness."
26 N.J.R. 1558-59 (Apr. 18, 1994).  Shortly thereafter, in July
1994, the New Jersey Supreme Court struck down the use of a
particularly restrictive project labor agreement by a state
agency, because it exceeded the agency's statutory power.  In
that case, George Harms Construction Co., Inc. v. New Jersey
Turnpike Authority, the Court explained:

> The New Jersey Legislature has delegated authority to
> purchase construction services to State agencies through
> a comprehensive set of bidding laws.  We have not
> previously understood those laws to confer on a public
> entity the authority to specify a sole source of
> construction services or to denote a specific union
> affiliation as a characteristic of the lowest-responsible
> bidder or as a bid specification.  When it has desired to
> do so in the past, the Legislature has specifically
> provided authorization for limitations on the source of
> construction services. . . . [However,] we do not believe
> that the standards of delegation set forth in our
> public-bidding laws yet embrace specifications for the
> type of project-labor agreement in this case.

137 N.J. at 43-44.  A year later, the New Jersey Supreme Court
affirmed its prior holding, and again invited the Legislature --
this time in even more stark terms -- to change state law:

> [W]e recognize that the Legislature is better suited than
> the judiciary to determine the size, complexity and cost
> of projects that justify recourse to a PLA.  We also
> believe that the Legislature is better suited to
> accommodate the several interests of labor, management,
> and the public.  Until such time as the Legislature acts,
> however, we are obligated to adjudicate such bid
> specifications case-by-case.

Tormee Const., 143 N.J. at 151 (citations omitted).

34

Then, in January 2002, Governor James McGreevey issued
Executive Order 1, which again authorized the use of project
labor agreements.  Executive Order 1 was supplemented by the
Legislature's enactment of the statute now before this Court,
N.J. Stat. Ann. § 52:38-1, et seq., which authorizes the use of
project labor agreements for state projects, as well as those of
counties, municipalities, and school districts.  In other words,
Governor McGreevey and the Legislature accepted the New Jersey
Supreme Court's invitation to provide blanket authority for the
use of restrictive project labor agreements.

Given this background, there is little basis to conclude
that the statute was enacted to provide a civil remedy against
project labor agreement violators.  Although Local 27, a union
and PLA signatory, can rightly claim to be "one of the class for
whose especial benefit the statute was enacted," State Com'n of
Investigation, 108 N.J. at 41 (quoting Cort, 422 U.S. at 78),
this alone is insufficient to establish a right of action.  The
legislative history demonstrates that the statute's main function
is to delegate power to state and local agencies, not to create a
personal right.  See Wisniewski v. Rodale, Inc., 510 F.3d 294,
301 (3d Cir. 2007) (holding that the legislature's intention of
creating a personal right is a prerequisite to finding a private
right of action).  Although the statute states that project labor
agreements "shall be binding on all contractors and

35

subcontractors working on the public works project," N.J. Stat. Ann. § 52:38-4, this is merely a restatement of the general law of contracts, not a recognition of any new rights.  Accordingly, as a private right of action is inconsistent with both the legislative history and the overall statutory scheme, the Court holds that the statute does not confer a civil remedy.

**CONCLUSION**

For the aforementioned reasons, summary judgment will be granted-in-part and denied-in-part as to all parties.  Summary judgment will be granted in favor of Sambe and Donnelly, and against Local 27, as to the statutory claim.  Summary judgment will be granted in favor of Local 27, and against Sambe and Donnelly, as to the breach of contract claim.  The parties shall promptly confer, and, within two weeks, advise the Court whether a genuine issue of material fact exists as to damages.  If so, the Court is prepared to conduct a trial on the matter of damages to begin on January 4, 2010.


Dated: December 3, 2009                    s/Renée Marie Bumb
                                           RENÉE MARIE BUMB
                                           UNITED STATES DISTRICT JUDGE