NOT FOR PUBLICATION                                    [Dkt. Ent. 135]

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY
CAMDEN VICINAGE

---

SHEET METAL WORKERS
INTERNATIONAL ASSOCIATION
LOCAL UNION NO. 27, AFL-CIO,

        Plaintiff,

        v.

E.P. DONNELLY, INC., and
SAMBE CONSTRUCTION CO. INC.,

        Defendants.

Civil No. 07-3023 (RMB/JS)

**OPINION**

---

Appearances:

Steven J. Bushinsky, Esq.
Mark E. Belland, Esq.
O'Brien, Belland & Bushinsky, LLC
1526 Haddonfield-Berlin Road
Cherry Hill, NJ 08003

    Attorneys for Plaintiff Sheet Metal Workers International
    Association Local Union No. 27, AFL-CIO

Louis Rosner, Esq.
1100 North American Building
121 South Broad Street
Philadelphia, Pa 19107

    Attorney for Defendant E.P. Donnelly, Inc.

Lawren H. Briscoe, Esq.
Melissa C. Angeline, Esq.
Jonathan Landesman, Esq.
Cohen, Seglias, Pallas, Greenhall & Furman, P.C.
30 South 17th Street, 19th Floor
Philadelphia, PA 19103

    Attorneys for Defendant Sambe Construction Co. Inc.

1

**BUMB**, UNITED STATES DISTRICT JUDGE:

This matter comes before the Court upon a motion for damages by plaintiff Sheet Metal Workers International Association Local Union No. 27, AFL-CIO ("Local 27"). For the following reasons, the Court will enter judgment in favor of Local 27, and against defendant E.P. Donnelly, Inc. ("Donnelly"), in the amount of $365,349.75.

## BACKGROUND

This case has a complex factual and procedural history, which is detailed in the Court's Opinion of December 3, 2010 (the "Summary Judgment Opinion"). See Sheet Metal Workers Intern. Ass'n Local Union No. 27, AFL-CIO v. E.P. Donnelly, Inc., __ F. Supp. 2d __, 2009 WL 4667101, *1-3 (D.N.J. 2009) (slip op. 3-9). In short, this case is about a construction subcontractor, Donnelly, which, by contracting, effectively promised the same roofing work to two competing labor unions. The operative contract -- the Egg Harbor Township Community Center Project Labor Agreement (the "PLA") -- required that all project participants be PLA signatories; nonetheless, Donnelly assigned the roofing work to Local 623, a non-signatory union, rather than Local 27. The National Labor Relations Board ultimately determined that Local 623 had a stronger claim to the disputed work, based upon Local 623's own collective bargaining contract with Donnelly and regional industry practice. The other union,

2

Local 27, which was promised but not ultimately awarded the work, brought this breach of contract action against Donnelly and the general contractor, Sambe Construction Co. Inc. ("Sambe"), for damages flowing from its lost work opportunity.  In the Summary Judgment Opinion, the Court partially granted and partially denied motions for summary judgment by all parties.  Of particular importance, the Court found that Sambe and Donnelly were liable for committing common-law breach of contract.

After granting summary judgment to Local 27 on the breach of contract claim, the Court scheduled a trial to determine damages, which was to begin on January 5, 2010.[1]  In the course of preparation for trial, however, the parties reached agreement that a trial was unnecessary because their differences in calculating damages turned mainly upon legal, rather than factual, determinations.  The parties therefore stipulated to the relevant facts, waived a damages trial, and consented to the Court's calculation of damages based upon their written

---

[1] The Court declined to grant summary judgment on the matter of damages, because it was not satisfied that no issues of material fact would be dispositive of a damages calculation. Without elaborating (as the Court later did), the Summary Judgment Opinion stated, "The parties' briefs do not discuss the matter of damages . . . ." Sheet Metal, 2009 WL 4667101, *10 n.26 (slip op. 31).  Local 27 sought reconsideration because its moving brief had indeed mentioned damages, thus, it said, making summary judgment on damages warranted.  On December 18, 2009, the Court denied reconsideration because, although Local 27's summary judgment brief had addressed damages in a "short and perfunctory" fashion, it had not established that an absence of genuine issues of material fact warranted summary judgment on damages.

3

submissions.  Upon the assurances of all counsel that no issues
of fact would be dispositive of a damages calculation, (Jt. Fnl.
Ptl. Ord., pts. III-IV [Dkt. Ent. 131]), the Court canceled the
trial and allowed the parties to brief the contested legal
issues, (Ord., Dec. 31, 2009 [Dkt. Ent. 132]).  After having
reviewed the completed briefing, however, the Court issued an
Order noting that two issues necessary to a determination of
damages remained unresolved.  (Ord., Feb. 9, 2010 [Dkt. Ent.
141].)  First, it became clear that calculating damages was not
possible without first determining whether Donnelly was bound by
Local 27's collective bargaining agreement (the "CBA"), which
would require a finding of fact.  Second, the parties had not
adequately briefed what damages arose as a consequence of Sambe's
contractual breach (as distinguished from Donnelly's breach).
The Court ordered a trial to resolve the first matter and
supplemental briefing to resolve the second.  (Id.)  In an
Opinion issued March 9, 2010, the Court resolved the second issue
by awarding only nominal damages to be paid by Sambe.  (Op., Mar.
9, 2010 [Dkt. Ent. 147].)  The Court then held a one-day trial on
March 18, 2010 to hear testimony about the binding effect of the
CBA.  By this Opinion and the accompanying Order, the Court
resolves the damages owed by Donnelly, and concludes this

4

action.[2]

## LEGAL STANDARD

New Jersey law controls the determination of damages for this breach of contract action.  See Sheet Metal, 2009 WL 4667101, *3 (slip op. 9) (applying New Jersey law).  Under New Jersey contract law, a non-breaching party is entitled to compensatory damages for the losses that arose from the breach. 525 Main St. Corp. v. Eagle Roofing Co., 34 N.J. 251, 254, 168 A.2d 33 (1961).  Compensatory damages are calculated to place the injured party in as good a monetary position as it would have enjoyed if the contract had been performed as promised.  Id. Here, as a general matter, Local 27 is entitled to the monetary value of whatever benefit it would have received but for the breach of contract.

By entering the Joint Final Pretrial Order, the parties voluntarily waived a host of factual and legal issues that are normally dispositive of contract damages.  (Ord., Dec. 31, 2009 [Dkt. Ent. 132].)  See also Ely v. Reading Co., 424 F.2d 758, 763-64 (3d Cir. 1970) ("[T]he pretrial order is generally binding

---

[2] The Court is aware that the NLRB's § 10(l) petition seeking to enjoin Local 27's prosecution of this action is now pending on appeal before the Third Circuit.  Importantly, the NLRB's petition sought not to enjoin this action, but rather Local 27's conduct in prosecuting the action.  See 29 U.S.C. § 160(l).  Because prosecution of the action has not been enjoined, and this Court now awards damages in favor of Local 27 thereby concluding the action, it would seem that the Third Circuit appeal may be moot.

on the parties.").  For example, Donnelly might have reduced the damages award by establishing that Local 27 failed to mitigate its damages (or, to the extent that Local 27 did mitigate its damages, Donnelly might have established that the damages award should be reduced by the value of Local 27's mitigating conduct). Similarly, Local 27 might have magnified the damages award by establishing that it suffered indirect consequential (or "special") damages as a result of Donnelly's breach.  Resolution of fact disputes is normally necessary to a damages calculation. Here, however, the parties opted to waive all potential fact disputes.[3]  Id.  Accordingly, the Court's damages inquiry shall be limited to calculating the compensation to which Local 27 would have been entitled had it performed the roofing work.

## FINDINGS OF FACT

### Stipulations

1. To carry out its subcontract, Donnelly utilized labor through Local 623, rather than Local 27.  (Jt. Fnl. Ptl. Ord., pt. II, ¶ 1.)

2. Labor on the community center project was performed by working foremen, journeymen, and apprentices of Local 623.  (Id.

---

[3] Importantly, the Court ordered a trial to determine the binding effect of the CBA only because the parties did preserve this as a disputed legal issue in the Joint Final Pretrial Order, (Jt. Fnl. Prtl. Ord., pt. VIII(A), ¶ 2), and despite the parties' waiver of all fact disputes, the Court determined that it could not resolve this legal issue without making findings of fact.

6

at ¶ 2.)

3. Both Local 623 and Local 27 utilize working foreman, journeyman, and apprentice classifications.  (Id. at ¶ 3.)

4. Exhibit 8 reflects the labor hours for the Project, categorized by the number of labor hours attributed to each classification as follows:

| Classification | Regular Hours | Overtime Hours |
|---|---|---|
| Working Foreman | 915.5 | 36 |
| Journeyman | 3430.5 | 121.5 |
| Apprentices | 709 | 18 |

(Id. at ¶ 4.)

5. Local 27 had a sufficient number of qualified working foremen and journeymen on its "out of work list" available for assignment for the foremen and journeymen hours as indicated above.  (Id. at ¶ 5.)

6. Local 27 did not have any apprentices on its "out of work list" available for assignment for the apprentice hours indicated above.  (Id. at ¶ 6.)

7. Local 27 did have journeymen on its "out of work list" available for assignment for the apprentice hours indicated above.  (Id. at ¶ 7.)

8. Donnelly requested, and Local 623 assigned, two Local 623 apprentices to work on the community center project.  The apprentices worked for a total of 727 hours on the project, 709

of which were for regular hours, and 18 of which were for overtime (as reflected in Exhibit 8).  (Id. at ¶ 8.)

9. Local 27's benefit funds are accurately reflected on the Local 27 rate sheet (Exhibit 5).  (Id. at ¶ 9.)

10. Gerry Campi manages all construction projects for Donnelly, and is affiliated with Local 623.  (Id. at ¶ 10.)

11. Mr. Campi was Donnelly's Project Manager on the community center project, and was Donnelly's highest level managerial employee on the project.  Mr. Campi performed managerial work, and occasional incidental "hands-on" work on the project.  Mr. Campi recorded 48 hours of work, which is reflected on Donnelly's certified payroll.  These hours are not included in the total foremen hours above.  (Id. at ¶ 11.)

12. The Local 27 CBA provides for a variable apprentice rate of 45 to 80 percent; a rate of 65 percent will apply here.  (Id. at ¶ 12.)

### The CBA[4]

13. On March 30, 2007, Ernest P. Donnelly, acting as Donnelly's agent, signed a "Letter of Assent," by which Donnelly "accept[ed] and agree[d] to be bound by terms and conditions of the Project Labor Agreement, together with any and all amendments

---

[4] All of the Court's findings of fact regarding the CBA are drawn from testimony and exhibits presented at the March 18, 2010 bench trial.  Because the parties had not ordered a transcript at the time this Opinion was issued, the Court does not cite particular page- and line-numbers.

and supplements now existing or which are later made thereto . . . ." (Ex. P-9; Trial tr., Mar. 18, 2010, at ___.)

14. The PLA, in article 2, § 4, provides: "This Agreement, together with the local Collective Bargaining Agreements appended hereto as Schedule A represents the complete understanding of all signatories . . . ." (Ex. P-3.) "Schedule A" is referenced repeatedly in the PLA. (See, e.g., id. at art. 11, §§ 1-2.)

15. At the time Donnelly executed the Letter of Assent, its agents had not read or seen the PLA or its Schedule A. In fact, Donnelly's agents had not read or seen the PLA or Schedule A at the time it assigned the roofing work to Local 623. Donnelly's agents only first reviewed the PLA in the course of the arbitration dispute underlying this case. (Trial tr., Mar. 18, 2010, at ___.)

16. Before reviewing the PLA, Donnelly's agents believed that it required only that hiring for the community center project would be limited to union labor. Donnelly did not know that the PLA in fact limited hiring to only PLA-signatory unions, nor that the PLA included a number of other restrictions. (Trial tr., Mar. 18, 2010, at ___.)

17. Schedule A was comprised of the collective bargaining agreements of the PLA-signatory unions. It was kept in a folder in the office of Egg Harbor Township Administrator Peter Miller, which was stored alongside a master copy of the PLA. Any PLA

9

signatory could ask to review the Schedule A collective bargaining agreements, and it was Mr. Miller's practice always to grant such requests.  Before this litigation, Donnelly never sought to inspect the Schedule A collective bargaining agreements.  (Trial tr., Mar. 18, 2010, at ___.)

18. Schedule A was compiled at the time the PLA was executed by each signatory-union submitting its collective bargaining agreement.  For unknown reasons, some unions never submitted their collective bargaining agreements.  Therefore, the Schedule A folder maintained by Mr. Miller contained most, but not all, of the collective bargaining agreements of PLA-signatory unions.[5] (Trial tr., Mar. 18, 2010, at ___.)

19. The Local 27 CBA was submitted at the time of the PLA's execution.  Since then, it has been in the Schedule A folder with the other PLA-signatory collective bargaining agreements, available for inspection and review, at all relevant times. (Trial tr., Mar. 18, 2010, at ___.)

20. Copies of the Schedule A collective bargaining agreements were given to Sambe agent Yan Girlya when Sambe became the general contractor on the community center project.  (Trial tr., Mar. 18, 2010, at ___.)

---

[5] Whether the collective bargaining agreements <u>not</u> contained in Mr. Miller's Schedule A folder were binding on PLA contractors is a question not before this Court.  It is undisputed that the Local 27 CBA was, at all relevant times, in Mr. Miller's Schedule A folder.

21. The Schedule A collective bargaining agreements were not stapled or otherwise physically affixed to copies of the PLA that circulated to project participants. (Trial tr., Mar. 18, 2010, at ___.)

22. Egg Harbor Township's practice of storing the Schedule A collective bargaining agreements and making them available for review is consistent with industry practice in the Southern New Jersey region.  Signatories to project labor agreements in the region are expected to, and generally do, understand, consistent with regular industry practice, that the "appended" Schedule A refers to collective bargaining agreements stored together with a master copy of the project labor agreement.  Stapling or otherwise affixing collective bargaining agreements to project labor agreements copies is <u>not</u> consistent with industry custom. (Trial tr., Mar. 18, 2010, at ___.)

23. Because Donnelly's agents did not read or see the PLA before hiring Local 623, they did not form any beliefs or conclusions about the meaning of the PLA's references to Schedule A, or the PLA's description of Schedule A as being "appended hereto."  (Trial tr., Mar. 18, 2010, at ___.)

24. At the time it signed the PLA, Donnelly's agents knew that they would be bound by the Local 27 CBA if they used Local 27 labor on the community center project.  (Trial tr., Mar. 18, 2010, at ___.)

11

## CONCLUSIONS OF LAW

### As to the CBA

1. The CBA was "appended" to the PLA, as that word is used in the PLA. The CBA is therefore binding upon Donnelly pursuant to the PLA. The Supreme Court of New Jersey has instructed that courts must interpret contracts, whether or not ambiguous, in the context of extrinsic evidence of their meaning. See Conway v. 287 Corp. Ctr. Assoc., 187 N.J. 259, 269-70, 901 A.2d 341 (2006). Webster's Dictionary defines "append" as, "1. To add as a supplement . . . . 2. To fix to: ATTACH." Websters II New Riverside University Dictionary 118 (1988). It further defines "attach" as, "1. To fasten on or affix to: connect or join. 2. To connect as an adjunct or associated part." Id. at 136. By insisting that the Schedule A collective bargaining agreements must have been physically affixed to the PLA, Donnelly relies upon the most narrow construction of "append". This construction finds no support in the relevant extrinsic evidence, however. Based upon industry custom, it would have been known to the contracting parties that the signatory-unions' collective bargaining agreements were "appended" insofar as they were "add[ed] as a supplement," "join[ed]," or "connect[ed] as an adjunct or associated part," id. at 118, 136, even if they were not physically affixed to the PLA. Mr. Miller's maintenance of a Schedule A folder stored along with a master copy of the PLA

12

easily satisfies the contracting parties' understanding of the term "appended".

2. Alternatively, even if the CBA had not been "appended" to the PLA, it would still have been binding upon Donnelly under the PLA.  The only reasonable interpretation of the PLA is that the collective bargaining agreements of PLA-signatory unions comprise Schedule A, and are binding upon contractor-employers.  Donnelly would have the Court hold that the entirety of Schedule A was not binding upon any of the PLA signatories because of the fortuitous fact that it was neither stapled nor physically affixed to PLA copies.  The PLA states, "This Agreement, together with the local Collective Bargaining Agreements appended hereto as Schedule A represents the complete understanding of all signatories . . . ." (Ex. P-3.)  Is the Court to believe that a signatory seriously interested in discerning the obligations created by the PLA would understand this sentence to mean, "If no collective bargaining agreements are appended to my copy of the PLA, then the Schedule A repeatedly mentioned in the PLA does not exist"?  Of course not.  In fact, Donnelly's own agent, Mr. Campi, testified to knowing that if he had assigned the roofing work to Local 27, he would have been bound by the Local 27 CBA.  Thus, while Mr. Miller's maintenance of a Schedule A folder was sufficient to "append" Schedule A to the PLA, the Schedule A collective bargaining agreements would have been binding upon PLA-parties

13

whether or not appended.

3. Alternatively, even if the PLA did not bind Donnelly to the CBA, the Letter of Assent bound Donnelly to the CBA. Donnelly has relied exclusively on its threadbare argument that the CBA was not "appended" to the PLA, as it says the PLA requires. But the Letter of Assent does not use the word "appended". Rather, the Letter of Assent states that signatories "agree to be bound by terms and conditions of the Project Labor Agreement, together with any and all amendments and supplements . . . ." (Ex. P-9.) The collective bargaining agreements of PLA-signatory unions are "supplements", which, pursuant to the Letter of Assent, were binding upon Donnelly irrespective of whether they were "appended" to the PLA.

4. Failure to affix Schedule A to PLA copies, if it was error at all, was harmless. Mr. Campi testified to having assigned the roofing work to Local 623 without ever having read the PLA. Thus, Donnelly was not in any way prejudiced by the failure to staple or physically affix Schedule A to the PLA, because Donnelly, when it breached the PLA, had never read the document in any event. In other words, Donnelly did not know when it acted whether Schedule A was affixed or not; thus, even had Schedule A been affixed, Donnelly would have undertaken

precisely the same conduct.[6]

5. For the alternative reasons stated in paragraphs 1 to 4, above, Donnelly was bound by the terms of Local 27's CBA.  Local 27's CBA, read together with the PLA, will therefore determine how Local 27 would have been compensated had Local 27 been assigned the roofing work.

<u>Other Disputed Legal Issues</u>

6. The damages award <u>should not</u> include compensation for the

---

[6] It is remarkable that Donnelly has so vigorously relied upon the CBA not being "appended" to the PLA, in light of the fact that Donnelly's assigning agents had never read the PLA in the first place.  The legal argument propounded by Donnelly is completely divorced from the actual facts underlying this case.

At trial, Donnelly propounded a related, and similarly confounding, argument.  Donnelly elicited testimony that the mayor of Egg Harbor Township had approved Local 623's work on the community center project while the Township negotiated PLA revisions with Local 623.  By this testimony, Donnelly seemed to imply that it had assigned the roofing work to Local 623 in reliance upon the mayor's assurances that Local 623 would ultimately be added as a PLA signatory.  This is plainly contradicted, however, by Mr. Campi's testimony that Donnelly did not know that the PLA barred assignment of work to non-signatory unions, nor that Local 623 had not signed the PLA.  In other words, while Donnelly sought to attribute its breaching conduct to the mayor, Mr. Campi conceded that the breach was caused only by Donnelly's own failure to appreciate its obligations under the PLA.  Even had Donnelly relied upon the mayor's assurances, however, it is unclear why the mayor would be privileged to waive the rights of Local 27 under the PLA.  Donnelly might have had an indemnification claim against the mayor, the Township, or Local 623, but this would not affect Local 27's right to recover for Donnelly's breach.  In any event, as the Court stated at trial, this argument -- wrong as it may be -- implicates liability, not damages, and it was not properly raised at the summary judgment stage of this proceeding, <u>Laborers' Int'l Union of North America v. Foster Wheeler Energy Corp.</u>, 26 F.3d 375, 398 (3d Cir. 1994) ("An issue is waived unless a party raises it in its opening brief . . . ."), nor preserved in the Joint Final Pretrial Order.

work of Mr. Campi.  Mr. Campi, the Donnelly supervisor who is a
member of the carpenters' union, worked 48 hours on the roofing
project.  The PLA specifically exempts supervisors from its
restrictions.  It provides:

> The following persons are not subject to the provisions
> of this Agreement, even though performing work on the
> Project:
> a. Superintendents, supervisors . . . .

(PLA, art. 3, § 2.)  Accordingly, had Local 27 performed the
roofing work, Donnelly would not have been required to hire a
Local 27 member to conduct the 48-hours of work undertaken by Mr.
Campi.  Local 27 contends, however, that Article 3, section 2 of
the PLA does not mean what it says.  According to Local 27, the
provision prohibits an employer from assigning to a supervisor
bargaining unit work.  This is a confusing interpretation, since
the provision does not affirmatively require or prohibit anything
at all; by its terms, it operates only to exempt certain
categories from the contract's restrictions.  The Court cannot
see how one could reasonably read this provision, as Local 27 now
suggests, to restrain contracting parties in any way.  Because
Donnelly could still have hired Mr. Campi to do the same
supervisory tasks even if Donnelly had contracted with Local 27
to perform the roofing work, Local 27 is not entitled to the
value of wages and fringe benefits for his 48 hours of work.[7]  In

---

[7] Local 27 criticizes the plain reading of this provision by
warning that "[a]n employer would be free to staff a work site

other words, had Donnelly complied with the terms of the PLA, and
Local 27 received the benefit of its contractual bargain,
Donnelly would still have been permitted to retain Mr. Campi for
community center project work.

7. The damages award <u>should</u> include the 727 hours of
apprentice labor performed on the community center project,
calculated at Local 27's journeymen rate.  Although Donnelly does
not dispute that 727 hours of apprentice labor was necessary to
complete the roofing work, it maintains that it was not required
to use Local 27 members to perform the work, since Local 27 did
not have any available apprentices on its "out of work" list at
the time.  Local 27 concedes that no apprentices were available,
but argues that its CBA permits the referral of Local 27
journeymen when apprentices are unavailable.  Donnelly, however,
relies upon PLA article 4, § 2(A), which allows contractors to
obtain labor from "another competent source" if a PLA-signatory
union cannot fill a request for labor.  (<u>See</u> PLA, art. 4, §
2(A).)  The defect in Donnelly's reasoning lies in its
presumption that Local 27 would have been "unable to fill [its]

---

[exclusively] with employees it deemed supervisors to the
detriment of any union." (Local 27's Dmgs. Br. 27.)  It is not
disputed, however, that Mr. Campi's work was in fact supervisory.
Certainly, if a subcontractor exploited this provision by hiring
only workers it fraudulently labeled "supervisors", a union
entitled to the work would challenge such an obvious abuse by
employing the PLA's various enforcement procedures.  (<u>See, e.g.</u>,
PLA, arts. 7-10.)  The hypothetical prospect of abuse does not
lead the Court to depart from the provision's plain meaning.

request for qualified employees . . . ," which is the PLA's
predicate condition for non-union hiring.  (Id.)  Indeed, Local
27 would have been able to fill Donnelly's request for qualified
employees, since Local 27 journeymen were available to perform
the apprentice work.  The PLA provides that "[a]pprentices . . .
shall be employed in a manner consistent with the provisions of .
. . Schedule A."  (Id. at art. 13, § 1.)  Local 27 has said that
its CBA, which was part of Schedule A, requires the assignment of
journeymen to apprentice work when apprentices are unavailable.
(Local 27's Dmgs. Br. 18-19.)  Although the Local 27 CBA may be
subject to interpretation on this point, Donnelly has never
argued that it would have had the discretion under the Local 27
CBA to hire non-Local 27 apprentices, rather than Local 27
journeymen, for apprentice work.[8]  Accordingly, the Court must
conclude that Local 27 journeymen would have conducted the
apprentice work for Donnelly.  The 727 hours of apprentice labor

---

[8] The Court understands article four of the CBA as granting
to Local 27 the discretion to determine what number of
journeymen, apprentice, and pre-apprentice workers is "necessary
to properly execute work contracted for by the Employer . . . ."
(CBA, art. IV.)  Since the CBA contains some ambiguity on this
point, Donnelly could have chosen to contest Local 27's
interpretation of its CBA.  It did not do so.  Instead, Donnelly
put all of its proverbial eggs in the basket of its contention
that it was not bound by the CBA.  Of course, any issue not
properly raised by Donnelly is waived.  See Laborers' Int'l Union
of North America, 26 F.3d at 398.

will therefore be awarded to Local 27 at the journeymen rate.[9]

8. The damages award <u>should</u> include the fringe benefits that Local 27 and its members would have received had it been assigned the roofing work.  The Joint Final Pretrial Order states Donnelly's contentions that damages should be limited to union dues and/or lost wages, but should not include benefits.[10]  (Jt. Fnl. Ptl. Ord., pt. VIII(B), ¶¶ 2-3.)  However, Donnelly failed to argue this point in its brief and the Court can see no reason to deny Local 27 and its members a benefit they would have received had they performed the work.  Simply mentioning an argument as one point in an outline is not sufficient to put that argument before a court for decision.  <u>See</u> <u>Simmons v. City of Philadelphia</u>, 947 F.2d 1042, 1066 (3d Cir. 1991).  Rather, "[p]articularly where important and complex issues of law are

---

[9] Donnelly might have responded by relying on a disputed proposition of fact, namely, that Donnelly would have hired non-Local 27 apprentices, rather than Local 27 journeymen, in these circumstances.  However, Donnelly waived all fact disputes in this proceeding.

Donnelly further cites PLA article 2, § 7 for the proposition that it could not discriminate against Local 623 in the hiring of apprentices.  This argument proves too much.  If Donnelly were correct, the entire PLA scheme -- which limits project participation to only PLA-signatory unions -- would be discriminatory.  The Court will not read the PLA to prohibit the very thing it requires.

[10] To the extent that Donnelly seeks to draw a distinction between Local 27 and its members, this issue has not been squarely raised or thoroughly addressed by anyone in the course of this litigation.  Because the damages award will inure to the benefit of Local 27's members, the Court makes no such distinction.

presented, a far more detailed exposition of argument is required to preserve an issue." Id. (quoting Frank v. Colt Industries, 910 F.2d 90, 100 (3d Cir. 1990)).[11]

9. Local 27 seeks a "Work Assessment Fee" only as an alternative to its claim for fringe benefits. Because the Court awards fringe benefits, it need not address this alternative issue.

10. Based upon the foregoing, the Court calculates damages as follows:

a. Foremen

Regular wages: $41.76 x 915.5 hours   = $38,231.28

Overtime wages: $104.13 x 36 hours   = $3,748.68

Benefits: $27.66 x 951.5 total hours   = $26,318.49

b. Journeymen

Regular wages: $39.76 x 3430.5 hours   = $136,396.68

Overtime wages: $101.13 x 121.5 hours   = $12,287.30

Benefits: $27.66 x 3,552 total hours   = $98,248.32

c. Apprentice work at journeymen rate

Regular wages: $39.76 x 709 hours   = $28,189.84

Overtime wages: $101.13 x 18 hours   = $1,820.34

---

[11] Donnelly's brief does argue that Local 27's calculation of benefits engages in "pyramiding" (or double-counting), which is impermissible under the PLA. (Donnelly's Dmgs. Br. 7-8.) This issue was not preserved in the Joint Final Pretrial Order, so the Court need not address it. In any event, Local 27's reply brief contains a thorough refutation of Donnelly's argument. (Local 27's Dmgs. Repl. Br. 5-9.)

Benefits: $27.66 x 727 total hours     = $20,108.82.

11. Based upon the calculations detailed in paragraph 10, as well as the findings of fact and conclusions of law set forth above, the Court finds that had Local 27 been assigned the roofing work, it would have been entitled to payment of $365,349.75.  Accordingly, the Court will award damages in that amount.

### ATTORNEYS' FEES AND COSTS

Finally, Local 27 seeks attorneys' fees and costs as the prevailing party in this litigation.  In considering this request, the Court applies the traditional "American Rule," which normally precludes a fee award to the prevailing party.  <u>Chin v. Chrysler LLC</u>, 538 F.3d 272, 279 (3d Cir. 2008) (citations omitted).  Despite this rule, Local 27 seeks an award of fees and costs based upon two narrow exceptions.

1.  <u>Bad Faith</u>

The first exception cited by Local 27 is that fees and costs may be awarded when the non-prevailing party has acted with bad faith.  Here, Local 27 cites Donnelly's conduct underlying this litigation, as well as the conduct of counsel in mounting their defense.  With one exception, the Court finds that neither conduct amounts to the "bad faith" contemplated by the American Rule exception.

While the Court has written disapprovingly of Donnelly's

conduct in creating for itself conflicting contractual
obligations, see Sheet Metal, 2009 WL 4667101, *9 (slip op.
28-29) (characterizing Donnelly as acting with "unclean hands"
and engaging in "unconscientious conduct"), the Court has heard
no evidence that Donnelly acted with knowing or purposeful
intent.  In fact, the Court also described Donnelly as having
"[w]alk[ed] blindfolded through [its] business affairs . . . ."
Id.  Donnelly has itself said that it assented to the PLA without
reading the document, which, although possibly foolish and
irresponsible, was not motivated by malice or even consciousness
of its conduct's consequences.  Donnelly's conduct may have been
careless; it was apparently not, however, in bad faith.

Likewise, the Court finds that, in general, Donnelly and
Sambe have not litigated this matter in bad faith.  The Court has
been critical of the defendants for relitigating already-resolved
questions and, in one instance, for propounding an argument that
conflicted with an earlier position.  See id. at *8 n.21 and
accompanying text (slip op. 24 n.21).  The defendants did not,
however, seek to gain unfair advantage or to employ vexatious
litigation tactics, such as unreasonable delay or excessively
burdensome motion practice (except as set forth below).
Advancing already-rejected and self-contradictory arguments may
be imprudent, but it does not necessarily evince bad faith.
Local 27 further criticizes the defendants for opposing a

22

pre-discovery summary judgment motion on the ground that it was premature, but then engaging in only minimal discovery.  The Court will not penalize Sambe and Donnelly merely because their discovery proved unfruitful.  Furthermore, it was Local 27, not Sambe and Donnelly, which sought numerous extensions of the factual discovery deadline.  (See, e.g., Ord., Apr. 29, 2009 [Dkt. Ent. 86]; Ord., Mar. 31, 2009 [Dkt. Ent. 85].)  Thus, it seems unfair to charge only the defendants with prolonging the burdens of discovery.

In one instance, however, the Court does find bad faith by Donnelly.  Donnelly's argument, discussed at length in this Opinion, that it was not bound by the CBA because the CBA was not "appended" to the PLA, has perplexed this Court.  The argument, in addition to being wrong as a legal matter, was completely belied by the facts.  The fact is, Mr. Campi, who was responsible for assigning the roofing work, never saw the PLA, so he would not have known whether the CBA was affixed to the PLA or not, nor would his assignment of work to Local 623 have been different had the CBA been affixed to Donnelly's copy of the PLA.[12]  Most importantly, Mr. Campi testified at trial, quite candidly, that

-------

[12] Mr. Campi's testimony did not come as a surprise.  He offered the same testimony before the NLRB, and Donnelly maintained in its Rule 56.1 Statement of Material Facts that it "never saw the PLA itself as it was not presented with the contract documents and was not aware that [Local 623 was] not included [as a signatory to] the PLA."  (Donnelly's Stat. Mat. Fcts. ¶ 5 [Dkt. Ent. 90].)

he "would have had to" use Local 27's CBA to determine compensation and benefits if Donnelly had used Local 27 members for the roofing work.  In other words, the entire inquiry -- the parties' briefing, the trial, the Court's Opinion -- was nothing more than an academic exercise, because, <u>whether or not the PLA had bound Donnelly to the CBA as a legal matter, the CBA's provisions would still have determined Local 27's compensation as a factual matter</u>.  Donnelly appeared to tacitly recognize this fact by using Local 27's CBA for such calculations as Local 27's standard rates of pay.  When asked by the Court on a conference call [Dkt. Ent. 140] why the CBA should control some damages determinations but not others, Donnelly did not provide an explanation.  In this Court's view, there was no reasonable explanation.  As such, the Court is left to conclude that Donnelly's pursuit of this argument was designed to delay the Court's damages ruling, resulting in needless work for its adversary.  Accordingly, the Court finds that because Donnelly pursued this argument in bad faith, Local 27 should be awarded fees and costs associated with its litigation of this issue.

    2.   <u>"Common Benefits"</u>

The second exception to the American Rule cited by Local 27 is that fees and costs may be awarded "to successful litigants who confer a common benefit upon a class of individuals not participating in the litigation."  <u>Polonski v. Trump Taj Mahal</u>

<u>Associates</u>, 137 F.3d 139, 145 (3d Cir. 1998) (citing <u>Mills v.</u>
<u>Electric Auto-Lite Co.</u>, 396 U.S. 375, 391-92 (1970)).  The
exception exists to ensure that a single plaintiff who, by
litigation, vindicates the rights of a class of others, is not
unfairly burdened with the expenses of litigation.  <u>Id.</u>  Although
Local 27 is quite right that its members will benefit from the
damages awarded here, they will also share the costs of
litigating this action.  The common benefits exception does not
apply when, as here, there is no inequity to correct.
Accordingly, the Court will not depart from the traditional
American Rule on this basis.

## CONCLUSION

For the reasons stated herein, as to Local 27's breach of
contract claim against Donnelly, judgment will be entered in
favor of Local 27 and against Donnelly in the amount of
$365,349.75.  Local 27 is instructed to file an itemized petition
reflecting the fees and costs it incurred subsequent to the
Court's February 9, 2010 conference call (excluding its work on
the issue of Sambe's liability).

Dated: <u>March 26, 2010</u>              <u>s/Renée Marie Bumb</u>
                                    RENÉE MARIE BUMB
                                    UNITED STATES DISTRICT JUDGE